# CIRCUIT COURT OF HENRICO COUNTY

In re Custody of
Nataya Dominique Terry

Case No. CJ08-61-00

BY JUDGE CATHERINE C. HAMMOND

November 13, 2008

This matter is before the Court on an appeal of an Order entered March 3, 2008, (*nunc pro tunc* to February 29, 2008) by the Juvenile and Domestic Relations District Court ("JDR Court"). On appeal, the case is considered *de novo*.

The uncontested pleadings show that Nataya Terry (Nataya) is a five-year-old girl. Her natural mother is Kelly Grzegorczyk (Kelly). Her natural father is Casey Lee Terry (Casey). Nataya has been living with Zoe Richards and her husband, Joshua Fazenbaker, (Zoe and Joshua) since 2006. They want to adopt Nataya.

Nataya has been in the custody of Zoe since January 2006. On February 1, 2006, the JDR Court entered a custody Order. It provided that, "on agreement of the parties, sole legal and physical custody of Nataya is awarded" to Zoe, with reasonable visitation to Kelly and Casey, to be allowed in Zoe's sole discretion.

This case began with Kelly's petition, filed April 30, 2007, in the JDR Court, to return custody of Nataya to Kelly. The JDR Court denied Kelly's petition. It granted continued custody of Nataya to Zoe and Joshua "pending adoption or further order of this Court." The JDR Court also denied a petition for custody and visitation filed by a grandmother, Aurelia Terry.

In the same Order, the JDR Court also ruled on a petition filed by Zoe and Joshua respecting "the proposed adoption" of Nataya. On July 10, 2007, the JDR Court's Order permitted Joshua and Zoe to file an "Amended Petition" asking the JDR Court to waive consent of the birth parents under Va. Code §§ 63.2-1205 and 63.2-1202(H). The JDR Court conducted a full hearing on February 29, 2008. The Order waived certain consents, which are required by statute in order for an adoption to proceed.

The JDR Court made extensive factual findings in support of its decision, including the following. "By clear and convincing evidence the Court has found that the consents of the biological parents are waived and further, that based upon the circumstances of this case . . . a return of or change of custody to the mother, father, or [grandmother] would be detrimental to Nataya's best interest." The JDR Court also found that "[b]y written consent agreement dated January 31, 2006, the biological parents transferred sole custody of Nataya to Zoe Richards."

*Motion to Dismiss*

The natural parents, Kelly and Casey, move to dismiss the adoption portion of the appeal. They argue that no jurisdiction exists in this case to govern any prospective adoption. No petition for adoption has been filed in the Circuit Court. They contend that the provisions of Va. Code §§ 63.1-1202 and 63.1-1205 do not apply when there has been no parental placement (sometimes called direct placement), no agency placement, and no foster care placement. The 2006 Order, according to the parents, was an Order consenting to temporary custody and did not evidence any other purpose.

Zoe and Joshua argue that subject matter jurisdiction does exist. In their letter memorandum, dated October 8, 2008, they point to three bases for jurisdiction. First, they argue that § 16.1-241(A)(5) provides jurisdiction "where the termination of residual parental rights and responsibilities is sought." Second, they argue that §§ 63.2-1205 and 63.2-1233 provide for consents to adoption to be executed or waived in the JDR Court. Third, they allege desertion under § 63.2-1202(H), which, if proved, would obviate the requirement of consent.

For the reasons that follow, the motion to dismiss the adoption petition will be granted.

There are five regular types of adoption recognized in the Code of Virginia: (1) agency placement adoptions, §§ 63.2-1221 to 63.2-1229; (2) parental placement adoptions, §§ 63.2-1230 to 63.2-1240; (3) stepparent adoptions, Sections 63.2-1241 to 63.2-1242; (4) close relative adoptions,

§§ 63.2-1242.1 to 63.2-1242.3; and (5) adult adoptions, §§ 63.2-1243 to 63.2-1244.

A parental placement adoption requires consent of the natural or birth parents, unless a statutory exception applies. Sections 63.2-1202, 63.2-1233. The procedure for obtaining consent lies in the JDR Court. The JDR Court has "exclusive original jurisdiction . . . over all cases, matters, and proceedings involving . . . [p]etitions filed in connection with parental placement adoption consent hearings pursuant to Va. Code § 63.2-1233. . . ." Section 16.1-241(U).

This case does not involve a parental placement within the meaning of the Code. The Code defines a parental placement as "locating or effecting the placement of a child or placing of a child in a family home by the child's parent or legal guardian *for the purpose of foster care or adoption.*" Section 63.2-100 (emphasis added). The 2006 custody Order does not mention any placement for the purpose of foster care or adoption. In their memorandum in opposition to the motion to dismiss, Zoe and Joshua stipulate that neither birth parent placed Nataya with them for adoption.

Without a parental placement, jurisdiction in the JDR Court must be based on some other law authorizing the involuntary termination of parental rights or the adoption of a child over the objection of her parents.

> When circumstances arise where society through the due process of its laws determines that a parent is no longer entitled to be a parent and that the relationship should therefore be terminated, it is evident that more must be demonstrated than a difference in values, morality, or parental philosophy. . . . Proceedings for the involuntary termination of parental rights can be direct, such as a petition to terminate residual parental rights or to grant permanent placement in foster care, or secondary, where adoption is sought over the objection of a parent.

Swisher, Diehl, Cottrell, *Family Law: Theory Practice and Forms*, § 14:3 (2008 ed.).

The first argument for jurisdiction, § 16.1-241(A)(5), refers to a statutory procedure for the involuntary termination of residual parental rights after custody has been transferred. See Section 16.1-283. While Zoe and Joshua now argue that this forms a basis for the JDR Court's decision to waive parental consent, there was no pleading filed to request termination of parental rights, and the JDR Court's Order did not refer to a termination proceeding. A

separate proceeding was not instituted as is required by § 16.1-283(A). Thus jurisdiction cannot rest on § 16.1-241(A)(5).

Next, Zoe and Joshua cite §§ 63.2-1205 and 63.2-1233 as authority for the JDR Court's jurisdiction, even though they concede that this is not a parental placement case. In their letter dated October 8, 2008, they state, "Under this section [63.2-1205] either the circuit court or the juvenile and domestic relations district court can consider whether the consent of any person is withheld contrary to the best interests of the child." In support of this argument, Zoe and Joshua rely on several reported cases in which an adoption was granted over the objection of natural parents who did not consent. However, these cases are distinguished from the instant case. In each of these cases, the party seeking to adopt the child filed an adoption petition in the circuit court.

For example, in *Gray v. Bourne*, 46 Va. App. 11 (2005), Ms. Bourne took custody of the child in 2001 after the child's mother was arrested. In 2002, Ms. Bourne and her husband obtained legal custody, and, in 2003, they filed a petition for adoption in the circuit court. Both of the birth parents refused to consent to the adoption. The adoption was granted upon the circuit court's finding that consent to the adoption was withheld unreasonably and contrary to the child's best interests. This proceeding was in the circuit court, not the JDR Court.

In *Hickman v. Futty*, 25 Va. App. 420 (1997), the facts were very similar to the case at bar, as the birth mother maintained that she only wanted to leave her child temporarily with the grandmother. The paternal grandmother (Futty) and her husband had taken in the child and her mother after the child's father was incarcerated. Later, the mother left but the child stayed in the Futty's home. In 1992, the Futtys obtained legal custody of the child, with the birth parents having limited, supervised visitation. In 1996, the Futtys filed an adoption petition in the circuit court. The child's mother did not consent. The circuit court found the mother's withholding of consent to be contrary to the child's best interest and granted the adoption over the mother's objection.

Also, in *Winfield v. Urquhart*, 25 Va. App. 688 (1997), the natural father of two children was convicted of murdering the children's mother. The children were placed with the Urquharts, and the Urquharts were granted legal custody of the children in 1992. Two years later, the Urquharts filed a petition for adoption in the circuit court. The children's father refused to consent to the adoption. The trial court found that the father "unreasonably withheld" consent and granted the adoption petition. Relying in part upon the predecessor to Va. Code § 63.2-1205, the Court of Appeals found that the

children's father unreasonably withheld his consent to the adoption and that the adoption was in the children's best interests.

Likewise, in *Dyer v. Howell*, 212 Va. 453 (1971), the child's mother was killed by the child's father. A county agency placed the child with the Howells and in 1966 they petitioned the circuit court for adoption. The child's father, Dyer, objected. In 1967, the JDR Court ordered custody with the Howells. In 1968, the father married and then petitioned to regain custody. His wife also petitioned for adoption. The circuit court considered all of the actions together, the adoption petition and the custody petitions denied the petitions for a change of custody and granted the Howells' petition for adoption. The Supreme Court affirmed the circuit court's finding that Dyer had withheld consent contrary to the child's best interests.

A review of these cases shows that they were decided in the circuit court, after a petition for adoption was filed under § 63.2-1201. That Section provides: "Proceedings for the adoption of a minor child and for a change of name of such child shall be instituted only by petition to a circuit court. . . ." These cases do not support the claim that the JDR Court had authority to determine whether to waive the consents of Kelly and Casey in the case at bar. They would be relevant if and when a petition is filed in this court.

Finally, Zoe and Joshua argue that the natural parents deserted Nataya and this provides jurisdiction pursuant to § 63.2-1202(H). This statute eliminates the need for consent from:

> a birth parent who, without just cause, has neither visited nor contacted the child for a period of six months prior to the filing of the petition for adoption. The prospective adoptive parent(s) shall establish by clear and convincing evidence that the birth parent(s), without just cause, has neither visited nor contacted the child for a period of six months prior to the filing of the petition for adoption.

Section 63.2-1202(H), by its express language, applies only to a petition for adoption. Here, no petition for adoption has been filed. To reiterate, a petition for adoption must be filed in circuit court. Va. Code § 63.2-1201. The circuit court can waive consent when an adoption petition has been filed and the birth parent has failed to contact or visit the child within the six months preceding the filing of the petition. This section does not authorize the JDR Court to waive consent based on the birth parent or parents' failure to maintain contact, before any petition for adoption is filed. Thus Code § 63.2-1202(H) does not apply.

*Custody*

On appeal, custody is heard *de novo*, "with the burden of proof remaining upon the party with whom it rested in the juvenile court." *Alexander v. Flowers*, 51 Va. App. 404, 413 (2008). Kelly's petition for modification of custody, filed April 30, 2007, is the original pleading in this case. By that time Nataya was already in Zoe's custody pursuant to the 2006 Order. The parent attempting to regain custody, after an Order has been entered transferring custody to another, bears the burden of proving that the circumstances have so changed that it would be in the child's best interests to transfer custody to the petitioning parent. *Dyer*, 212 Va. at 456. Evidence on this portion of the appeal will be heard on November 17, 2008.

November 19, 2008

This is an appeal of a custody Order entered March 3, 2008, (*nunc pro tunc* to February 29, 2008) by the Juvenile and Domestic Relations District Court ("JDR Court"). This Court heard the evidence on November 17, 2008, together with the arguments of counsel and the guardian ad litem for the child, Nataya Terry (Nataya).

The evidence showed that Nataya was born on October 7, 2003. Her mother, Kelly Grzegorczyk (Kelly), and her father, Casey Lee Terry (Casey), were not married, but they lived together in Richmond. Both Kelly and Casey have appealed. For two years and four months, Nataya lived with her mother. For a time Nataya and Kelly moved around from place to place, and they lived for a period with Casey's mother, Aurelia Terry, in Richmond.

In late, 2005 Kelly faced several difficult problems, including loss of her employment, loss of her driving license, prosecution for driving on a suspended or revoked license, and she was pregnant with another child. In January 2006, the Henrico Department of Social Services (DSS) intervened for Nataya's protection. There was marijuana found in Kelly's home. Nataya was ill with an infection. Kelly and Casey faced the likelihood that Nataya would be placed in foster care. In order to avoid foster care placement, Kelly and Casey agreed for a friend, Zoe Richards (Zoe), to have temporary custody of Nataya. Zoe had worked with Kelly at a restaurant in Richmond and already had a relationship with Nataya. Zoe frequently cared for Nataya and, in 2004, Kelly had permitted Nataya to travel to Ohio with Zoe to visit Zoe's family there.

On February 1, 2006, the JDR Court entered a custody Order. It provided that "on agreement of the parties, sole legal and physical custody of

Nataya is awarded" to Zoe with reasonable visitation to Kelly and Casey, to be allowed in Zoe's sole discretion.

After the February 2006 transfer of custody, Kelly took steps to comply with criteria set by DSS, intending to regain custody of Nataya. DSS advised that Kelly needed to obtain stable employment and housing, and complete certain education requirements, including a class called SCAN. Completion of the SCAN class was delayed through no fault of Kelly, as the class was unavailable to her for several months.

In the eleven-month remainder of 2006, Kelly only visited with Nataya on four occasions, even though Zoe and her husband lived nearby and did not oppose visits. Zoe testified credibly that, at the start, she expected Kelly to regain custody. Zoe thought that she would have Nataya for about six months and then she would return to her mother's custody. During this period, Kelly gave birth to her third child, Marcus, in February 2006. The father of Marcus and Randy, Kelly's fourth child, is not Casey Lee Terry. His social worker testified that Marcus was placed with his grandfather in 2006 and Kelly did not complete the steps that would have been necessary to regain custody of Marcus. Also during this time, Kelly had to decide whether to try to take custody of her daughter, Briana, who was born in 1995 but had not been living with Kelly.

On February 18, 2006, Casey and his mother visited briefly with Nataya at a restaurant near Zoe's home in Williamsburg. That was Nataya's last visit with her father. In July 2006, Casey was incarcerated on conviction of a felony and he remains incarcerated today. He will be released in 2009.

In February 2007, Kelly and Zoe met at a Panera restaurant. This was about two weeks before Kelly was scheduled to finish the SCAN class. At this meeting, Zoe informed Kelly that she intended to move to Ohio and take Nataya with her. Kelly objected to this, explaining that she was almost finished with the education requirement that she understood to be a prerequisite to her regaining custody. She asked Zoe to wait.

On April 30, 2007, Kelly filed her petition to regain custody of Nataya, which petition is the subject of this appeal. Zoe responded with a petition for adoption filed in the JDR Court. By separate letter opinion dated November 13, 2008, this Court dismissed the adoption petition, finding the JDR Court was without subject matter jurisdiction to waive consents of the birth parents. Also in April 2007, Kelly gave birth to her fourth child, Randy. Randy is the only child who now lives with Kelly.

On June 13, 2007, the JDR Court continued the case, in large part due to Casey's incarceration. The Order entered that day required that any party intending to relocate provide thirty days advance written notice. After that,

Zoe and her husband did move permanently to Ohio. They failed to give written notice until October 24, 2007.

Since the relocation, there has been very little contact between Kelly and Nataya. Kelly was doubtful that the street address she had for Zoe's home was the correct address. She also felt rebuffed when she telephoned. Likewise Casey's mother felt that she was not able to gain access through Zoe. A once-friendly relationship had become strained by Zoe's decision to pursue adoption over the objection of Kelly and Casey. The evidence was essentially undisputed that Kelly did not initiate contact more than twice after the move. However, Zoe did make trips to Virginia and contacted Kelly to offer to set a visit with Nataya during those trips.

Since February 2006, Nataya has lived with Zoe and her husband, Joshua Fazenbaker. They have been married since 2005 and have a stable home in Stout, Ohio. They have provided for all of Nataya's needs. On August 11, 2008, Zoe and Joshua had twin boys and Nataya has a good relationship with them. She also has good relationships with Zoe's extended family in Ohio.

Kelly is employed full-time in Richmond in a position that has good benefits. She has maintained this employment for two years. She has a two-bedroom apartment for herself and Randy. Randy's father recently moved out of the home and broke off his relationship with Kelly. He continues to provide support for Randy.

Kelly's petition for custody is heard *de novo*, "with the burden of proof remaining upon the party with whom it rested in the juvenile court." *Alexander v. Flowers*, 51 Va. App. 404, 413 (2008). As the parent attempting to regain custody, after entry of an Order transferring custody to another, Kelly bears the burden of proving that the circumstances have so changed that it would be in the child's best interests to transfer custody to the petitioning parent. *Dyer v. Howell*, 212 Va. 453, 456 (1971). While the evidence showed that Kelly and Casey were not fully aware of the consequences of the voluntary relinquishment of Nataya, the law is that Kelly and Casey gave up certain legal rights back in February of 2006. The presumption in favor of the parents no longer applies. A similar situation is presented in *Long v. Holt-Tillman*, 2004 Va. App. LEXIS 239 (2004). But, in that case, the mother visited more often with the child than is the case here. Nevertheless, the trial court continued custody with the non-parent.

The evidence showed a material change in circumstances since the 2006 custody Order. Kelly has greatly improved her situation with a good job and suitable housing. She has completed the education classes that DSS assigned, resolved her criminal charges and showed responsibility caring for Randy. The

more difficult question is whether the evidence shows that it would be in Nataya's best interests to return Nataya to the custody of her mother.

All of the factors in Virginia Code § 20-124.3 have been considered. In addition, a significant factor is the biological parent-child relationship. *Roberts v. Roberts*, 41 Va. App. 513, 531 (2003) ("Parents have a fundamental right to determine how to raise their children, and we presume that fit parents act in their children's best interest." (citing *Troxel v. Granville*, 530 U.S. 57, 65 (2000)). While Kelly has improved her living situation, it is somewhat unpredictable. She is a single mother with no driver's license. In considering the one child in her care, Randy, his father recently deserted both him and Kelly, which is not an indication of stability.

It also is significant that Kelly was not able to maintain visits with her young daughter during the twelve months after the 2006 Order. She faced difficult problems during that time, and Casey was incarcerated. However, while the parents confronted their own problems, Nataya was developing an attachment to Zoe and Joshua. Nataya is very well adjusted to her home and enjoys school and other activities such as gymnastics. Zoe is affectionate with Nataya and cares for her as if she were her daughter. Joshua also has a good relationship with Nataya. He has made efforts to facilitate visits between Nataya and her mother during trips to Virginia.

The weight of the evidence persuades me that Nataya's best interests would best be served by continuing legal and physical custody with Zoe Richards, with visitation scheduled for Kelly on regular dates every six to eight weeks. Zoe should provide for transportation to the visits. No visitation with Casey will be Ordered under the present circumstances of his incarceration.

The case will not be remanded.